## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
## WESTERN DIVISION
Civil Action No. 5:23-ct-3332

| | | |
|---|---|---|
| JOSHUA JOHNSON, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| STEADMAN JODY GREENE, in his | ) | **COMPLAINT** |
| individual capacity; COLUMBUS | ) | |
| COUNTY SHERIFF WILLIAM ROGERS | ) | |
| in his official capacity; BERNETTA | ) | |
| CRAWFORD, in her individual capacity; | ) | |
| TRINA WORLEY in her individual | ) | |
| capacity; and WESTERN SURETY | ) | |
| COMPANY, in its capacity as Surety on | ) | |
| the Official Bond of the Sheriff of | ) | |
| Columbus County, | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |

## INTRODUCTION

1.      On August 3, 2022, Plaintiff Joshua Johnson was almost killed in a brutal assault at the Columbus County Detention Center.

2.      In October 2022, the Columbus County District Attorney petitioned to remove Defendant Steadman Jody Greene from his office as the Sheriff of Columbus County, in part because of the assault on Mr. Johnson.

3.      Based on an independent investigation of the assault and jail practices at the time of the assault, the removal petition stated that Defendant Greene "permitted dangerous, and potentially deadly conditions to exist in the Columbus County Detention Center."  It noted that Mr. Johnson "made a request to detention center staff to be moved out of the pod he was housed in immediately prior to the assault, for concerns of his safety."  It concluded that jail practices

1

showed "a habitual failure to provide adequate supervision of inmates in the weeks prior to the assault."

4.      After the assault, Mr. Johnson was airlifted to Wilmington.  Medical professionals initially did not expect him to survive.   Although he did not die, the assault changed his life forever.  Mr. Johnson suffered a severe traumatic brain injury, and now has recurring migraines, persistent respiratory problems, limited stamina, cognitive deficiencies, severe anxiety, and panic attacks.  He struggles to perform tasks he once did easily, to be a father to his children, and to live the life he wants and should be able to live.

5.      Mr. Johnson was assaulted and suffers these long-term physical and psychological injuries because Defendants flagrantly disregarded the safety of the detention center's inmates, including his safety on August 3, 2022.

6.      This is a civil action seeking damages from Defendants Steadman Jody Greene in his individual capacity; Columbus County Sheriff William Rogers in his official capacity; Trina Worley in her individual capacity; Bernetta Crawford in her individual capacity; and Western Surety Company, in its capacity as surety on the official bond of the Sheriff of Columbus County, for violations of 42 U.S.C. § 1983, the North Carolina Constitution, and North Carolina common law.

**THE PARTIES**

7.      Plaintiff Joshua Johnson is a resident of Columbus County, North Carolina.

8.      Defendant Steadman Jody Greene was sworn into office as the Sheriff of Columbus County in or around December 2018 and remained in office during the events at issue. Upon information and belief, Defendant Greene is a citizen and resident of Columbus County. He is sued in his individual capacity.

9.    Defendant Sheriff William Rogers was sworn in as Sheriff of Columbus County on or around January 5, 2023.  Upon information and belief, Defendant Rogers is a citizen and resident of Columbus County.  He is sued in his official capacity.

10.    Defendant Bernetta Crawford is a resident of Columbus County, upon information and belief.  At all relevant times Defendant Crawford was an employee of the Columbus County Sheriff's Office and a correction officer at the Columbus County Detention Center.  She is sued in her individual capacity.

11.    Defendant Trina Worley is a resident of Columbus County, upon information and belief.  At all relevant times, Defendant Worley was an employee of the Columbus County Sheriff's Office and the captain in charge of the Columbus County Detention Center.  She is sued in her individual capacity.

12.    Defendant Western Surety Company is the surety on the official bond of the Sheriff of Columbus County pursuant to N.C. Gen. Stat. § 162-8 and § 58-76-5.  Upon information and belief, Western Surety Company is owned by Continental Casualty Corporation, which is owned by Continental Corporation, a wholly owned subsidiary of CNA Financial Corporation.  Upon information and belief, Defendant Western Surety Company is authorized to conduct business in North Carolina.  Plaintiff institutes this action individually and, with respect to the claims on the official bond of the Sheriff of Columbus County, also on behalf of the State of North Carolina pursuant to N.C. Gen. Stat. § 58-76-5, *et seq.*

13.    Upon information and belief, Defendants Greene and Rogers were insured during their time as Sheriff by liability insurance purchased pursuant to N.C. Gen. Stat. § 153A-435 or other applicable state law with respect to all acts and omissions complained of herein, or participated in a government risk pool pursuant to N.C. Gen. Stat. § 58-23-5, or maintained a

3

funded reserve, and to such extent, Defendants Greene and Rogers have waived any official, sovereign, qualified, or governmental immunity to which they might otherwise be entitled in their official capacities.

## JURISDICTION AND VENUE

14.     This Court has original jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3)-(4).  This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

15.     Venue is proper in this district under 28 U.S.C. § 1391 because the causes of action arose in Columbus County, North Carolina.

## FACTS

### A.     The Columbus County Detention Center

16.     The Columbus County Detention Center ("the CCDC" or "the jail") is operated by the Columbus County Sheriff's Office.  Defendant Greene was the Sheriff of Columbus County from on or about December 3, 2018, until on or about October 24, 2022.  Defendant Worley was the Captain over the CCDC beginning in or about March 2022 until 2023.  At all relevant times, Defendants Greene and Worley had final policymaking authority over the policies, practices, and customs adopted and implemented at the CCDC.  As Captain over the jail, Defendant Worley was additionally responsible for day-to-day supervision, training, and direction of detention officers at the jail.

17.     Defendants operated the CCDC in an extremely unsafe manner with a flagrant disregard for inmate safety and the legal requirements for North Carolina detention facilities.

18.     Defendants and the officers under their supervision failed to conduct required surveillance rounds at the CCDC.  State regulations require that detention facilities conduct

surveillance rounds at least twice per hour, with no more than 40 minutes between rounds. *See* 10A NCAC 14J .0601(a). The officer conducting the round is required to directly observe each inmate in the facility during each round.

19. The CCDC used an electronic system to monitor correction officers' rounds. Officers waved a "wand" at various points throughout the jail as they did their rounds to record the times and locations of each round.

20. The CCDC had a longstanding and well-recognized practice of ignoring the requirement to conduct surveillance rounds, failing to conduct any surveillance rounds for hours at a time, and failing to otherwise ensure that inmates received any meaningful supervision.

21. For example, when Johnson was assaulted shortly after 2:00 p.m. on August 3, 2022, more than eight hours had passed without any officer conducting any surveillance round. On both August 1 and 2, 2022, periods longer than eight hours passed without officers conducting any rounds. On July 31, 2022, more than ten hours passed without officers conducting any rounds.

22. Defendants failed to conduct required supplemental supervision of inmates. In addition to supervision rounds, state regulations require that jails "utilize one or more supplemental methods of supervision 24 hours a day, 7 days a week." 10A NCAC 14J .0601(b). Supplemental methods of supervision are (1) direct two-way voice communication; (2) remote two-way voice communication; (3) direct visual observation; and (4) video surveillance.

23. The CCDC had video surveillance cameras throughout the jail. Its written policies stated that officers assigned to the control room were responsible for monitoring the jail's live surveillance feeds, and that "[a]ny suspicious, unusual, or threatening behavior that is detected by control room officers will be immediately reported to shift supervisor and/or

lieutenant, so that direct observation of inmates can be implemented." Upon information and belief, the jail had a longstanding and well-established practice of ignoring this written policy by failing to observe the live surveillance feeds and/or failing to report suspicious, unusual, or threatening behavior observed on the feeds.

24. The CCDC had emergency call buttons located throughout cells and pods. The call buttons functioned as an intercom that allowed inmates to speak with correction officers. Officers told inmates to use the call buttons if they needed to contact a correction officer because of an emergency.

25. The CCDC had a longstanding and well-recognized practice of ignoring inmates when they pressed the emergency call button. When officers did respond, it was often up to an hour or more later.

26. The CCDC had a longstanding and well-established practice of placing gang-affiliated inmates in pod HA-143, regardless of the gang with which the inmates were affiliated, and then failing to conduct any meaningful supervision of that pod. The CCDC then permitted the inmates to control the pod. Correction officers referred to HA-143 as the "gang pod." These practices reduced correction officers' workload but significantly increased the threats posed to inmates housed in the gang pod.

27. HA-143 was a two-story pod, in which a number of cells were oriented around a shared common space with a bathroom, shower, and several tables. During the day, detainees were permitted to mix with each other in the common area.

28. HA-143 was notoriously dangerous. It held numerous inmates charged with serious violent crimes and known histories of violence in the jail. It was common for inmates to get into fights in HA-143. Officers, including Defendants, were aware of the routine fights

between inmates, but made no effort to protect the inmates or prevent future fights. For example, in the week leading up to Mr. Johnson's assault, there were at least two other fights in HA-143 so severe that blood was drawn. Officers did not respond to the fights in any way.

29. By engaging in the above-described practices, the jail and its correction officers knowingly created an extremely unsafe environment in which detainees knew they were not being properly supervised, felt they could engage in violence with impunity, and did, in fact, engage in violence with impunity.

30. Defendants Greene and Worley knew or should have known that the CCDC's policies, customs, and practices were egregiously deficient. They knew or should have known that the CCDC's policies, customs, and practices violated federal and state law and created extreme and unjustifiable risks to people housed at the jail. Nonetheless, they failed to correct and update these policies, customs, and practices, and failed to otherwise implement proper procedures they knew or should have known would have prevented needless violence among inmates.

31. Defendants Greene and Worley were aware of significant deficiencies in the CCDC's policies, practices, and customs, and failed to adequately instruct and train correction officers on duties regarding inmate housing, supervision, surveillance, monitoring, and violence prevention.

**B.    The Assault on Joshua Johnson**

32. On July 29, 2022, Plaintiff Joshua Johnson was incarcerated in the CCDC as a pretrial detainee on several misdemeanor charges, because he could not afford to post bond on those charges. Mr. Johnson was initially locked up in a quarantine cell for several days under the jail's COVID-19 protocols.

33. On August 3, 2022, Defendant Crawford was the ranking officer on duty. Defendant Crawford removed Mr. Johnson from his quarantine cell and chose to place him in HA-143, the gang pod. When Crawford made the decision to place Mr. Johnson in HA-143, she knew he was in pretrial detention for several misdemeanors and was not gang-affiliated. She also knew the gang pod was extremely dangerous; knew guards did not supervise or monitor the gang pod; knew the pod housed numerous inmates who were gang-affiliated and incarcerated on serious felony charges, including first degree murder; knew the pod housed numerous inmates with a history of engaging in violence at the jail; and knew Mr. Johnson would be vulnerable to attack.

34. Crawford told Mr. Johnson he was not going to like his assignment. She then took him to HA-143, told him it was a gang pod, and asked if he had problems with anyone in the pod. Although Mr. Johnson initially said he did not, he then saw someone he did have a problem with. Mr. Johnson told Crawford about the threat, that it was not safe for him to be in the pod, and that he needed to be removed. Crawford ignored Mr. Johnson's concerns. She told him to "deal with it" and ended the conversation.

35. Crawford knew Mr. Johnson was at a significant risk for serious physical injury if he remained in the gang pod. She nevertheless chose not to move Mr. Johnson, or investigate the threats he faced, or take any other action to keep him safe.

36. After Crawford placed Mr. Johnson in the gang pod, inmates in the pod began threatening him. Well before 2:00 p.m. that day, other inmates began physically intimidating and verbally harassing Mr. Johnson as he walked around the pod. Correction officers ignored the obviously escalating environment in the pod.

37.     At 2:08 p.m., Mr. Johnson moved his mattress and personal belongings from his cell on the second floor and placed them by the pod's door in an attempt to get correction officers to remove him from the pod. Correction officers disregarded these very visible efforts to seek protection from the threat he now clearly faced in HA-143.

38.     As the threat of danger to Mr. Johnson in the pod escalated, he repeatedly pressed the emergency call button to get correction officers to help him. They ignored his calls for help.

39.     It was obvious other inmates were about to attack Mr. Johnson. For example, they took off their socks, which inmates often do before they are about to fight someone on a slippery floor. Correction officers ignored this obvious sign of imminent threat to Mr. Johnson's safety.

40.     At 2:16 p.m., four inmates grabbed Mr. Johnson, pulled him into a cell, and brutally beat him while another stood guard outside the cell door. Two of Mr. Johnson's assailants were being held on murder charges. The assailants beat Mr. Johnson until he was nearly or fully unconscious. His pants were pulled down in the course of the assault and he defecated.

41.     At 2:18 p.m., the assailants left Mr. Johnson lying in the cell. He tried to crawl out of the cell several times over the next several minutes but was pushed back into the cell by his attackers.

42.     At 2:28 p.m., Mr. Johnson staggered out of the cell and collapsed. His assailants moved him back into the cell.

43.     At 2:34 p.m., Mr. Johnson's assailants removed him from the cell and put him in the showers. They then conferred behind a shower curtain, fully dressed, with their feet visible at the bottom of the shower.

44.     Other inmates began repeatedly pressing the emergency call button in an attempt to get help for Mr. Johnson.  Correction officers ignored their calls.

45.     At 2:41 p.m., Mr. Johnson walked out of the shower, clearly in severe medical distress, and collapsed onto the floor.  Upon seeing this, several other inmates quickly scattered from the pod's common area and returned to their cells, leaving Mr. Johnson alone on the floor.  Over the next couple of minutes, Mr. Johnson managed to stand back up and briefly lean against the stairwell before falling back to the ground.

46.     At approximately 2:45 p.m., Officer Brandon Gore returned from his lunch break, glanced in the pod, and saw Mr. Johnson lying incapacitated on the floor.

47.     At 2:46 p.m., correction officers finally entered the pod to assist Mr. Johnson.

48.     Except for the activity inside the cells and behind the shower curtain, video of all of the foregoing was broadcast live to correction officers through the jail's surveillance system, through two separate cameras.

49.     Correction officers either violated the CCDC's official written policies and state regulations by choosing not to watch the surveillance feeds, or violated the CCDC's official written policies and state regulations by observing the feeds and choosing not to respond to the obvious threats to Mr. Johnson's safety, his obvious attempts to escape the cell, the other inmate's obvious attack on him, and his obvious and life-threatening injuries.

50.     Mr. Johnson was assaulted at 2:16 p.m. on August 3, 2022.  The correction officers on duty had been on duty since 7:00 a.m.  At the time of his assault, the officers on duty had not conducted a single surveillance round during their entire shift.

51.     All of the correction officers' actions and inactions described above were consistent with the jail's longstanding customs and practices, and with the training and expectations provided to employees by Defendants Crawford, Worley, and Greene.

52.     Mr. Johnson was first admitted to Columbus Regional Health and then transferred by helicopter to New Hanover Regional Medical Center, where he was intubated and received a ventriculostomy.  He was hospitalized for nearly two weeks.  Medical staff initially did not expect him to survive the assault.  The Columbus County District Attorney waited to bring criminal charges against Mr. Johnson's assailants only because it was initially unclear whether the charge would be first-degree murder rather than attempted murder.

53.     Mr. Johnson survived, but suffered severe injuries, including multiple bone fractures and a serious traumatic brain injury.  He continues to live with severe physical and psychological injuries as a result of his assault, including persistent migraines, limited physical stamina, respiratory problems, cognitive and memory deficiencies, severe anxiety, and panic attacks.  He can no longer work and struggles to help take care of his children.

**C.     The Petitions to Remove Jody Greene as Sheriff.**

54.     In August 2022, the State Bureau of Investigation ("the SBI") opened an investigation into the Columbus County Sheriff's Office and Mr. Johnson's assault.

55.     On October 4, 2022, Columbus County District Attorney Jon David filed a petition with the Columbus County Superior Court to remove Defendant Greene from his position as Columbus County Sheriff, pursuant to N.C. Gen. Stat § 128-16 *et seq* and Article VI, § 8 of the North Carolina Constitution.  The court immediately suspended Greene from office and set a hearing on the removal petition for October 24, 2022.

56.     The District Attorney filed an amended removal petition on October 21, 2022, based in part on the assault of Mr. Johnson and Greene's mismanagement of the CCDC.

57.     The petition recognized that Mr. Johnson had "made a request to detention center staff to be moved out of the pod he was housed in immediately prior to the assault, for concerns of his safety."

58.     The petition noted the jail's "fail[ure] to perform mandatory checks on inmates as required by statewide policies and procedures. This failure to perform checks was not isolated to this particular incident, but appeared to show a habitual failure to provide adequate supervision of inmates in the weeks prior to the assault."

59.     The petition faulted Defendant Greene for "fail[ing] to properly supervise officers in his employ and permit[ing] dangerous, and potentially deadly conditions to exist in the Columbus County Detention Center."

60.     The removal petition also cited other misconduct by Greene engaged, including racial profiling of employees, abuse of authority, and engaging in a sexual relationship with a subordinate.

61.     On October 24, 2022, Greene appeared in Superior Court and chose to resign his office, rather than contest any of the grounds for his removal. But he continued to campaign for reelection as Columbus County Sheriff.

62.     Columbus County commissioners appointed Defendant William Rogers as Sheriff following Greene's resignation.

63.     In November 2022, Greene was reelected as Columbus County Sheriff.

64.     On December 29, 2022, Green was sworn into office. The same day, the District Attorney filed a second petition for his removal, again including the grounds regarding the assault of Mr. Johnson and the jail's practices.

65.     On January 4, 2023, Greene again appeared in Superior Court for a hearing on the second petition for his removal.  As before, he chose to resign from office at the outset of the hearing rather than contest any of the grounds for his removal.

66.     Rogers was again appointed as Sheriff of Columbus County and sworn into office on or around January 5, 2023.

## FIRST CAUSE OF ACTION
**(42 U.S.C. § 1983 – U.S. Const. Amend. VIII, XIV)**

67.     The allegations in the preceding paragraphs are incorporated by reference.

68.     This claim is brought against Defendants Crawford, Worley, and Greene in their individual capacities.

69.     Defendants had actual and/or constructive knowledge that the CCDC's policies, practices, and customs fostered inmate violence and placed inmates, including Mr. Johnson, at a substantial risk of serious harm.  Defendants had actual and/or constructive knowledge that inmates, including Mr. Johnson, faced a substantial risk of being attacked by other inmates in HA-143.

70.     Defendant Crawford did not respond reasonably to these known risks.  Defendant Crawford disregarded the excessive risk to Mr. Johnson's safety by, *inter alia*, failing to monitor and supervise inmates at the CCDC, failing to supervise her subordinates, permitting her subordinates to disregard their obligations to monitor and supervise inmates at the CCDC, placing Mr. Johnson in HA-143, failing to remove him from HA-143, and failing to take any other steps to ensure he was not exposed to a substantial risk of physical harm.

71.     Defendants Worley and Greene did not respond reasonably to these known risks. Defendants Worley and Greene disregarded the excessive risk to inmates' safety by, *inter alia*, failing to monitor and supervise inmates at the CCDC; permitting their subordinates to disregard their obligations to monitor and supervise inmates at the CCDC; failing to train and supervise their subordinates; endorsing and ratifying the jail's deficient practices, policies, and customs; and failing to take any other steps to ensure Mr. Johnson was not exposed a substantial risk of physical harm.

72.     Defendants' acts were undertaken with deliberate and/or reckless indifference to Mr. Johnson's constitutional rights.  When Defendants engaged in the misconduct referenced above, they could reasonably foresee that their actions created a substantial risk of serious harm to Mr. Johnson.

73.     Defendants were acting under color of state law when they engaged in the misconduct referenced above.

74.     Defendants' misconduct was a direct and proximate cause of the assault on Mr. Johnson.  If not for Defendants' actions, he would not have been attacked.

75.     Defendants' misconduct deprived Mr. Johnson of his liberty without due process of law in violation of the Fourteenth Amendment to the United States Constitution.

76.     Defendants' misconduct amounted to cruel and unusual punishment under the Eighth Amendment to the United States Constitution.

77.     Defendants are liable to Mr. Johnson for damages under 42 U.S.C. § 1983.

78.     Defendants' actions and inactions were done maliciously, willfully, or wantonly, or in a manner that demonstrates a reckless disregard for Mr. Johnson's rights.  As a result of Defendants' conduct, Mr. Johnson is entitled to recover punitive damages.

## SECOND CAUSE OF ACTION
### (42 U.S.C. § 1983 – Monell)

79.     The allegations in the preceding paragraphs are incorporated by reference.

80.     This claim is brought against Defendant Rogers his official capacity as the Columbus County Sheriff and Defendant Western Surety Company.

81.     At the time of the assault on Mr. Johnson, Greene and Worley were final policymakers responsible for the policies, practices, and customs of the CCDC.

82.     As of August 2022, the jail's policies, practices, and customs were deficient in:

      a.      Failing to protect inmates from the risk of inmate-on-inmate violence;

      b.      Failing to adequately instruct and train correction officers;

      c.      Concentrating gang-affiliated inmates in a single pod;

      d.      Failing to adequately supervise, monitor, and control the gang pod;

      e.      Failing to conduct adequate personal surveillance rounds;

      f.      Failing to monitor and respond to video surveillance feeds;

      g.      Failing to respond to emergency call buttons;

      h.      Failing to adequately respond to inmate-on-inmate violence; and

      i.      In other manners to be proved in discovery and at trial.

83.     The CCDC's deficient policies, practices, and customs made constitutional violations such as those suffered by Mr. Johnson almost bound to happen, sooner or later.

84.     Defendants created, condoned, endorsed, and failed to address the above-described policies, practices, and customs.  In the period surrounding Mr. Johnson's detention, Defendants Greene and Worley failed to adequately supervise, discipline, and train officers about their obligations regarding how to safely operate a detention facility and protect inmates from known risks of violence.

85. Defendants were deliberately indifferent to the deficiencies within the CCDC's policies, practices, and customs; were deliberately indifferent to the risks those deficiencies created for inmates held at the CCDC; and were deliberately indifferent to the constitutional rights of inmates. Defendants failed to take steps to correct these deficient policies, practices, and customs, and instead condoned and ratified these policies, practices, and customs.

86. As a direct and proximate result of Defendants' misconduct, Mr. Johnson was exposed to a substantial risk of physical violence, was brutally beaten by other inmates, and suffered physical, emotional, and pecuniary damages.

87. Defendant Rogers, in his official capacity, is liable to Mr. Johnson for damages under 42 U.S.C. § 1983.

## THIRD CAUSE OF ACTION
### (Negligence)

88. The allegations in the preceding paragraphs are incorporated by reference.

89. This claim is brought against Defendants Crawford, Worley, and Greene in their individual capacities; Defendant Rogers in his official capacity; and the Western Surety Company.

90. Defendants had duties including the following:

    a.    To ensure inmates were not placed at an unreasonable risk of physical harm;

    b.    To take reasonable steps to ensure inmates vulnerable to physical assaults were not housed with inmates likely to do them harm;

    c.    To respond reasonably when confronted with information demonstrating that an inmate faced a risk of physical harm;

    d.    To take reasonable steps to monitor and supervise inmates;

e.  To conduct personal surveillance rounds;

f.  To monitor video surveillance feeds and act when they showed threatening or suspicious conduct by inmates;

g.  To timely respond when an inmate pressed the emergency call button;

h.  To reasonably respond when inmates engage in physical violence;

i.  To comply with state and federal law regarding the supervision of inmates and the operation of detention facilities;

j.  To adequately train, supervise, and instruct subordinates regarding how to operate the CCDC;

k.  To exercise reasonable care in executing their duties at the CCDC; and

l.  In other respects to be proved through discovery and at trial.

91.  Defendants breached each of the duties described above by:

a.  Operating the jail in a manner which placed inmates at an unreasonable risk of physical harm;

b.  Housing vulnerable inmates, including Mr. Johnson, with dangerous inmates likely to do them harm;

c.  Ignoring Mr. Johnson when he said he was not safe and requested to be removed from the gang pod;

d.  Ignoring Mr. Johnson's repeated efforts to attract correction officer's attention after he was ignored;

e.  Failing to monitor and supervise inmates;

f.  Failing to conduct personal surveillance rounds;

g.    Failing to monitor video surveillance feeds and to act when they showed threatening and suspicious conduct.

h.    Ignoring inmates when they pressed the emergency call button;

i.    Failing to respond when inmates engaged in physical violence;

j.    Failing to train, supervise, and instruct correction officers regarding how to operate the CCDC; and

k.    In other respects to be proved through discovery and at trial.

92.    As a direct and proximate result of Defendants' negligence, Defendants fostered a dangerous environment in which inmates engaged in violence with impunity; Mr. Johnson was housed with dangerous inmates; his attempts to escape the pod were ignored; he was brutally beaten by other inmates; and he suffered physical, emotional, and pecuniary damages.

93.    Defendants' wrongful conduct was malicious, corrupt, and/or beyond the scope of their official duties.

94.    Because the misconduct of Defendants Crawford, Worley, and Greene occurred in the course and scope of their work as officers of the Columbus County Sherriff's Office, Defendant Rogers is liable for the misconduct in his official capacity.

94.    Defendants' actions and inactions were done maliciously, willfully, or wantonly, or in a manner that demonstrates a reckless disregard for Plaintiff's rights.  As a result of Defendants' conduct, Mr. Johnson is entitled to recover punitive damages.

## FOURTH CAUSE OF ACTION
### (Negligent Infliction of Emotional Distress)

95. The allegations in the preceding paragraphs are incorporated by reference.

96. This claim is brought against Defendants Crawford, Worley, and Greene in their individual capacities; Defendant Rogers in his official capacity; and the Western Surety Company.

97. Defendants acted with negligence and reckless indifference to the likelihood that their conduct would cause severe emotional distress.

98. It was reasonably foreseeable that Defendants' conduct would cause Plaintiff severe emotional distress.

99. Defendants' wrongful conduct was malicious, corrupt, and/or beyond the scope of their official duties.

100. As a proximate result of Defendants' wrongful conduct, Plaintiff was brutally assaulted and suffered severe emotional distress including panic attacks, severe anguish, fright, nervousness, trouble sleeping, anxiety, worry, shock, and despair.

101. Defendants' actions were done maliciously, willfully, or wantonly, or in a manner that demonstrates a reckless disregard for Plaintiff's rights. As a result of Defendants' conduct, Plaintiff is entitled to punitive damages.

102. Because the misconduct of Defendant Crawford, Worley, and Greene occurred in the course and scope of their work as officers of the Columbus County Sherriff's Office, Defendant Rogers is liable for the misconduct in his official capacity.

## FIFTH CAUSE OF ACTION
### (Intentional Infliction of Emotional Distress)

103. The allegations in the preceding paragraphs are incorporated by reference.

104. This claim is brought against Defendant Crawford in her individual capacity; Defendant Rogers in his official capacity; and the Western Surety Company.

105. Defendant Crawford's conduct was extreme and outrageous.

106. Defendant Crawford acted with reckless indifference to the likelihood that her conduct would cause Mr. Johnson severe emotional distress.

107. Defendant Crawford's wrongful conduct was malicious, corrupt, and/or beyond the scope of her official duties.

108. As a proximate result of Defendant Crawford's wrongful conduct, Plaintiff suffered severe emotional distress, including, but not limited to, panic attacks, severe anguish, fright, nervousness, trouble sleeping, anxiety, worry, shock, and despair.

109. Because the misconduct of Defendant Crawford occurred in the course and scope of her work as officers of the Columbus County Sherriff's Office, Defendant Rogers is liable for the misconduct in his official capacity.

110. As a proximate result of Defendants' wrongful conduct, Mr. Johnson has suffered severe emotional distress. Defendants' actions and inactions were done maliciously, willfully, or wantonly, or in a manner that demonstrates a reckless disregard for Plaintiff's rights. As a result of Defendants' conduct, Mr. Johnson is entitled to recover punitive damages.

## SIXTH CAUSE OF ACTION
### (North Carolina Constitution)

111. The allegations in the preceding paragraphs are incorporated by reference.

112. This claim is brought against Defendant Rogers in his official capacity and the Western Surety Company. This claim is brought in the alternative, to the extent the foregoing state causes of action do not provide Mr. Johnson an adequate state remedy.

113. In committing the foregoing acts and omissions, Defendants violated Mr. Johnson's constitutional rights under the North Carolina Constitution, including his rights under Article I, Sections 19 and 27.

114.    As a direct and proximate result of Defendants' misconduct, Mr. Johnson was exposed to a substantial risk of physical violence, was brutally beaten by other inmates, and suffered physical, emotional, and pecuniary damages.

115.    Defendants' actions and inactions were done maliciously, willfully, or wantonly, or in a manner that demonstrates a reckless disregard for Mr. Johnson's rights. As a result of Defendants' conduct, Mr. Johnson is entitled to recover punitive damages

**PRAYER FOR RELIEF**

Plaintiff requests the following relief:

(1)    That the Court declare Defendants' practices complained of herein are unlawful under 42 U.S.C. § 1983, the United States Constitution, the North Carolina Constitution, and North Carolina law;

(2)    That the Court enter judgement in favor of Plaintiff and against Defendants for compensatory damages in an amount in excess of $25,000, with the exact amount of the damages to be determined by a jury and the interest to be determined by the Court;

(3)    That the Court enter judgment in favor of Plaintiff and against Defendants for punitive damages in an amount in excess of $25,000, with the exact amount of the damages to be determined by a jury;

(4)    That the Court award Plaintiff pre-judgment and post-judgment interest;

(5)    That the Court award Plaintiff reasonable attorneys' fees and litigation expenses as provided by 42 U.S.C. § 1988;

(6)    That the costs of this action be taxed against Defendants; and

(7)     Such other and further legal and equitable relief as this Court deems necessary, just, and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues presented herein.

This the 1st day of December, 2023.

/s/ Paul E. Smith
Paul E. Smith, NC Bar No. 45014
psmith@pathlaw.com
Bradley J. Bannon, NC Bar No. 24106
bbannon@pathlaw.com
 100 Europa Dr., Suite 420
Chapel Hill, North Carolina 27517
(919) 942-5200

*Counsel for Plaintiff*